ROYMANN v. BROWN et al.

(Circuit Court of Appeals, Fifth Circuit. November 20, 1900.)

No. 916.

SHIPPING—INJURY OF STEVEDORE'S EMPLOYE—DEFECTIVE APPLIANCES.

　　Libelant's intestate, employed by stevedores in loading a ship, stepped upon a hatch cover, which tilted, and he fell through into the hold, receiving injuries from which he died. A steel coaming, over three feet in height, surrounded the hatchway, having a flange on the inner side, upon which the covers rested, and it appeared that such coaming had become bulged outward opposite the cover which gave way, so that such cover did not reach the flange or have a secure footing thereon. The weight of evi-

dence, however, showed that the vessel, which was new, and all its appliances, were in good condition when it was delivered to the stevedores for loading, and that the bulge in the coaming was caused by their negligence in permitting slings of cotton bales to strike against it in loading, which had proceeded but about four hours before the accident occurred. *Held*, that the owners were not guilty of any negligence which rendered them liable for the death, in the absence of proof that they or their agents had notice of the defect, and time and opportunity to repair it.

Appeal from the District Court of the United States for the Eastern District of Texas.

In this case a libel in personam was filed by Julia Roymann, in her own behalf and as next friend of her minor children, Thomas and Mike Roymann, alleging that on December 12, 1898, Jens Peter Roymann, husband and father of libelants, lost his life by negligence of respondents, owners of the British steamship Netherfield, and claiming $10,000 damages. The libel alleges that Roymann was a cotton screwman, a stevedore's employé, engaged in loading the ship; that the owners of the ship failed to furnish Roymann with safe appliances and apparatus and a safe place in which to work; that by reason thereof he was precipitated into the hold, and sustained mortal injuries, dying the same day. By amendment, it is alleged with particularity that Roymann lost his life on the first day he worked; that the construction of the outer flange hatch was improper and unsafe, because too narrow; that the hatch flange was bent or curved outwardly, and that such defect was not observable to Roymann when the hatch covers were on; and that the hatch covers had been put on by the officers and crew shortly before his death, and that they were charged with knowledge of the defect in the flange, and of its unsafe and dangerous condition. The libel further alleges that, by reason of the defect in the hatch flange, one of the hatch covers at the place where the hatch flange was bent was made liable to tilt, and that Roymann's duty required him to go down into the hold by means of the ladder, which was located in a dangerous place, viz. near the winch, which was 10 inches from the hatch coaming; and in adopting the method apparently safest, and which would have been safest but for the defective condition of the hatch flange and covers, a hatch cover on which he stepped tilted by reason of failing to catch on the bent hatch flange, acting as a trapdoor, throwing him 35 feet into the hold. The respondents deny negligence, and allege that the curve, if any, in the hatch flange was caused by the co-employés of Roymann permitting sling loads of cotton to strike against the hatch coamings, and that Roymann and his fellow servants removed part of the hatch covers from the forward port compartment, and were negligent in not removing them all. They deny that the winch and ladder were dangerously located, and deny that it was necessary for Roymann to cross the forward port compartment of No. 2 hatch to avoid being mangled by the winch, alleging that the safest way to the ladder was by passing the winch, and that the spring or bend in the hatch flange could have been seen by ordinary diligence, and circumstantially they deny all the allegations of negligence, and, further, the respondents charge contributory negligence. At the hearing the district court dismissed the libel, and the libelant prosecutes this appeal.

Forster Rose, Wm. T. Austin, and John C. Walker, for appellant.
J. Parker Kirlin and H. Pillans, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). The Netherfield was a vessel about two and a half years old, which had been running for a number of consecutive voyages constantly in the Galveston trade, coming out in ballast, and carrying back cotton and grain. On December 12, 1898, she was loading cotton exclusively, and was in the hands of the charterer's stevedore and his long-

shoremen, who were loading and stowing cargo. She was a well-built vessel, of the highest class at Lloyd's. Her No. 2 hatch was, for the convenience of the grain trade, provided with a high coaming of three feet five inches rise from the deck, made of steel, and reinforced by a half-round heading outside, and an inch and a quarter flange for receiving the ends of the hatch covers on the inside. This hatch was divided into three chambers by two athwart-ship beams of iron, fitted with appropriate sockets with three fore and aft beams, which fitted into the ends of the hatch and into these cross beams, one being the main or strong back, running fore and aft along the middle of the hatch, and the other two being the parallel beams on each side; and these fore and aft beams were each in three parts, a part for each chamber. The following diagram is in the record:

N. 2 Forward Hatch SS "Netherfield."

A, compartment through which Roymann fell; B, compartment used in lowering cotton.

The crew of the vessel had on the voyage out, and shortly before the vessel reached Galveston, in the business of painting and cleaning the hold, several times uncovered and recovered this hatch, and the officers examined as witnesses had been with the vessel a number of voyages. When the ship arrived at Galveston, and was turned over to the stevedore, with the hatches on, this No. 2 hatch was apparently in good condition. The covers were all good, and with clean edges. The stevedore's gang took possession of the ship and her deck and holds, and, as customary in Galveston, removed such hatches as they desired. They opened in this No. 2 hatch the middle compartment by taking the covers off, and they took off the fore and aft covers Nos. 1 and 5 of compartment A,—No. 1, to give access to the iron ladder which led down to the lower decks and the hold. The ship lay outside of the Jamaican, a larger vessel, and received her cotton from the wharf over the Jamaican, which was higher than the Netherfield; the cotton being hoisted into No. 2 hatch by the derrick rigged on the mast, and fixed not to swing, and the cotton was dragged up from the wharf across stagings on the Jamaican, and then

swung down towards the hatch of the Netherfield, and lowered into the hold. The stevedore controlled the operations of loading the vessel and handling the cotton-loading appliances, hatches, and the like. The loading operations began in the morning at 7 o'clock, and the injury occurred at about 11 o'clock, the loading up to that time having gone on actively. The cotton was taken in slings of three bales, the entire load weighing about 1,800 pounds. No stage or skid was placed between the top of the coaming and side of the Jamaican or rail deck of the Netherfield, but, according to the testimony of the stevedore's men, some cotton, which is variously stated by the witnesses at from one to three bales, was placed on the deck against the coaming; but this left a projection of from 12 to 18 inches of coaming above the cotton. The evidence is conflicting, but the preponderance establishes that the slings of cotton, after they were dragged over the Jamaican, were allowed to strike and drag with more or less force against the coaming. The decedent, having finished a turn of work on the wharf, went aboard the ship to go below and screw cotton, and, instead of going by the deck to the head of the ladder, he stepped across upon one of the hatch covers of compartment A, three of which had been left in place, and this cover tilted, and fell with him into the hold, whereby he received injuries from which he died. There was no difficulty in going from the deck directly over the coaming to the ladder, though there was a winch 10 inches from the forward end of the coaming of the hatch near the ladder, which had guards, and was entirely under the control of the winchmen. Whether the winch was in operation at the time is disputed. The foreman or boss who had charge of the operations and other witnesses testified that it was not running; others insisted that it was; but it is clear that the stoppage of the winch for the purpose of allowing a man to pass was a matter of a very short time,—a few moments. At the time Roymann went on the hatch covers to reach the ladder others were waiting for the winch to stop in order to go down the ladder in the usual way. It appeared, on an examination of the hatch coaming and hatches after the fall of Roymann, that there was an indentation inwardly in the coaming at the chamber through which the loading operations were carried on, and on the side on which the fall took place, and that there was a corresponding bulge outwardly in the coamings of the forward and after chambers on the same side, and this spread in the end compartment was a natural consequence of the crushing inward in the middle compartment; and it was admitted in open court on the trial that this effect could have been produced by the striking by the cotton cargo, while being hoisted aboard, against the outside of the coaming of the middle compartment, through which the loading was going on. In the examination which took place after the accident, it was also found that the hatch cover No. 4, in compartment A, which tipped with Roymann, was probably, through this bulging outward of the coaming there, a trifle short of reaching its footing upon the inner flange which was placed to receive it, and which ordinarily held it up.

On this state of fact, the libelant cannot recover. The controlling question is whether the ship Netherfield and her appliances, when

turned over to the stevedore and his men to be used in loading the ship, were in good condition, and reasonably safe and proper for the purposes intended; and, under the evidence, this depends on the time when the conceded bulge in the coaming of compartments A and B took place. There is nothing to show that it was prior to the arrival of the ship in Galveston. It could not have existed without speedy discovery, as the ship's crew had been removing and replacing the hatch covers in the business of cleaning and painting. No cause whatever is shown for such bulging after the ship's arrival until the cotton was taken on board. In dragging the cotton over the Jamaican, in the manner shown by the evidence, the striking of the sling loads against the coaming would naturally cause the bulge in question, and everything points to that as the cause. If the ship and its appliances were in good order when turned over to the stevedore and his men, and thereafter they became defective, we are satisfied that it was through the faulty use of the appliances by the stevedore and his men, and certainly for this the owners of the ship cannot be held responsible before their agents had notice of the defect, and time and opportunity to repair the appliances.

The matters involved in this case seem to us to be merely questions of fact, and the law thereon is so plain that we do not feel called on to cite text-books, nor to distinguish adjudicated cases, with which the briefs on both sides are full. Nor is it necessary to consider the assignments of error in detail, nor the question—much argued—as to whether the deceased, Roymann, was guilty of contributory negligence in crossing over a loose hatch cover to reach the ladder leading to the lower deck, instead of waiting for the winch to be stopped (if it was in action), so as to go below in the usual way. The decree of the district court in dismissing the libel is affirmed.